**ST. CHARLES ASSOCIATES, LTD.**

v.

**UNITED STATES of America.**

**Civ. No. N–86–3818.**

United States District Court,
D. Maryland.

Oct. 14, 1987.

John C. Murphy, Esquire, Baltimore, for plaintiff.

Peter M. Semel, Asst. U.S. Atty. for D. Md., Baltimore, Md., and Lars Hanslin, Office of Sol., U.S. Dept. of the Interior, Washington, D.C., for Government.

## MEMORANDUM

NORTHROP, Senior District Judge.

Under the inspiration and ownership of St. Charles Associates, Ltd., a former Catholic seminary, St. Charles College was converted into a retirement community called Charlestown. Following completion of the project, plaintiff sought final approval of the rehabilitation work done on the College from the National Park Service in order to qualify for a tax credit for the rehabilitation of certified historic structures established by the Tax Reform Act of 1976, Pub.L.No. 94–455, 92 Stat. 1519, and the Revenue Act of 1978, Pub.L.No. 95–600, 92 Stat. 2828 (current version at 26 U.S.C. § 48(g) (1986)). By letter of October 20, 1986, the Chief Appeals Officer for defendant, the Department of the Interior ("DOI"), denied approval for one portion of the project, a former dormitory known as the "College Building." Plaintiff initiated this suit to appeal that determination.

Presently before the Court are cross motions for summary judgment. After careful consideration of the pleadings filed by the parties, the Court finds that no hearing is necessary. Local Rule 6. For the reasons stated herein, the defendant's motion for summary judgment will be granted and plaintiff's motion denied.

The relevant facts are not in dispute. Plaintiff, St. Charles Associates, Ltd., owned a former Catholic seminary, St. Charles College, which consisted of seven structures located on a site of over 100 acres in Catonsville, Maryland. Among the buildings in the complex was a church, an administration building, a convent, a dining hall and most importantly for purposes of

this case, a dormitory built in 1961 known as the "College Building".

In 1982, plaintiff formulated plans to convert the former seminary into a modern retirement community. As part of this project, John Erickson, president of Retirement Health Services Corporation, a general partner in St. Charles Associates, investigated the possibility of obtaining a federal tax credit which provided a percentage credit for certain rehabilitation costs of "certified historic structures." (Erickson affidavit). Section 48(g) of the Internal Revenue Code charged the Secretary of the Interior ("Secretary"), under the aegis of the National Park Service ("NPS"), with making two classes of "certifications" preconditions to eligibility for the tax credit. Thus, the Secretary was to ascertain whether a renovation was performed upon a "certified historic structure" ("Part I certification") and whether the work performed qualified as a "certified rehabilitation" ("Part II certification"). Regulations for the issuance of these certifications were codified at 36 CFR Part 67.

In accordance with these regulations, in 1982, plaintiff submitted Part I and II applications, accompanied by detailed architectural drawings, for each of the seven buildings on the Charles College campus to the Maryland Historical Trust ("MHT"). No mention was made in these applications of long range plans for possible additional construction on the Charles College site. The documents were reviewed by MHT and forwarded to DOI with a recommendation that they be approved.

On July 21, 1983, DOI issued a determination that each of the seven buildings, including the College Building, qualified as a "certified historic structure." In addition, the department gave preliminary approval to plaintiff's rehabilitation plans cautioning, however, that "[i]f changes to the approved plans are necessary as you proceed with the work, we caution you to obtain in writing from the National Park Service a determination where such changes would enable the project to continue to meet the Standards for Rehabilitation.... Any substantive change in the work as described in the application should be brought to our attention prior to execution to ensure continued conformance to the Standards." (Defendant's Exhibit F).

Rehabilitation of the college building began shortly after receipt of DOI approval. On November 23, 1983, however, plaintiff was informed by DOI that Phase One approval of the College Building had been mistakenly granted due to a "clerical error", that the building was not a historic structure, and that the July 21 approval was revoked. (Defendant's Exhibit 4). Substantial work had, by this time, been performed on the College Building. Despite the revocation, plaintiff completed the renovation of the College Building in accordance with the plans previously submitted to DOI and began to assemble historical documentation to substantiate the contention that the College Building did in fact merit certification as an historic structure. By November 1984, rehabilitation of all seven buildings in original complex was complete.

By application dated December 5, 1984, plaintiff requested NPS certification of the completed rehabilitations of the seven buildings. (Defendant's Exhibit G). While this application was pending, plaintiff decided to initiate a second phase of construction on the Charles College site. In March 1985, plaintiff began work on "Phase Two" of the new retirement community, consisting of three buildings located contiguous to the college building. No information was provided to DOI about the new work.

Later that month, during the course of conducting an investigation of the Charles College site for the purpose of reviewing the application for certification, an official of the MHT learned of the phase two construction and notified the National Park Service of the new activity. (Defendant's Exhibit H). NPS then advised plaintiff that the certification requests for the original buildings could not be acted upon until additional information regarding the full scope of construction planned within the boundaries of St. Charles College was provided. (Defendant Exhibit 5). Plaintiff

subsequently furnished NPS with the requested information.

On January 10, 1986, DOI issued a determination that the College Building was historic. Simultaneously with that ruling, however, the Department also held that the College Building had lost its historic character because of the rehabilitation performed upon it and the new construction adjacent to it. Shortly thereafter, on February 10, 1986, the NPS denied certification approval for the rehabilitation of all seven buildings. (Defendant's Exhibit A). Plaintiff immediately appealed this decision. After an inspection of the Charles College site, the Chief Appeals Officer, Dr. Ernest Connally, issued a new decision on October 20, 1986 in which certification was granted for six of the structures, but denied for the College Building. Dr. Connally explained his action, in pertinent part, as follows:

My conclusion that the rehabilitation of the College Building does not meet the Secretary of the Interior's "Standards for Rehabilitation" and cannot be certified is based primarily on the fact that the historic character and identity of the building, as it existed before the rehabilitation, have been lost by the building's envelopment in the new construction of the additions to St. Charles College....

The new addition on the side of the College Building and the enlargement of the link between this structure and the Old Dormitory have re-oriented the structure away from the front of the campus. Furthermore, in the conversion of the St. Charles College campus into an extended-care retirement community, several new buildings were constructed in front of the College Building. This new construction figured largely in the February 10, 1986, determination by the National Park Service that the entire development project failed the test of the "Standards for Rehabilitation." While disagreeing with this evaluation of the new construction as it affects the entire historic district, I concur that the new buildings have overwhelmed the College Building, visually severing its connection to the row of historic buildings of which it was consciously designed to provide one ter-

minus. From the crucial point of view on the terrace in front of the Chapel, Administration Building and Old Dormitory, the College Building can scarcely be seen at all; it has been engulfed by the new buildings. (Defendant's Exhibit C).

■ Plaintiff filed the action at bar challenging the final administrative decision on the grounds that defendant improperly based its denial of rehabilitation certification upon the effect of adjacent new construction upon the College Building. In opposition to plaintiff's motion, and in support of its own motion for summary judgment, defendant argues that the regulations governing plaintiff's application clearly indicated that the impact of new construction upon an historic structure would be considered in determining whether to issue a certificate of rehabilitation. The primary issue, therefore, which faces the Court is whether the regulations in effect at the time plaintiff submitted its certification application identified adjacent new construction as a factor that might be considered by DOI in determining whether to grant rehabilitation certification. As an alternate ground for summary judgment, plaintiff contends that even if the regulations did encompass new construction, consideration of such construction is beyond the scope of authority granted to defendant by statute.

The Tax Reform Act of 1976, Pub.L. 94–455, 90 Stat. 1519, and the Revenue Act of 1978, Pub.L. 95–600, 92 Stat. 2828 created tax incentives for certain historic preservation work. Under 28 U.S.C. § 48(g)(2), incentives were available for rehabilitation work done upon a "certified historic structure" where such renovation was certified as being "consistent with the historic character" of the property. The Act delegated responsibility for making the requisite certification of rehabilitation work to the Secretary of the Interior.

Pursuant to this grant of authority, DOI promulgated regulations specifying procedures and standards to be used in considering certification requests. Regulations were first published in 1977, and then amended in 1981 at 36 C.F.R. § 67. These

**1078**

regulations defined a "certified rehabilitation" as "any rehabilitation of a certified historic structure ... which the Secretary has certified to the Secretary of the Treasury as being consistent with the historic character of such property, and, where applicable, with the district in which such property is located." 36 C.F.R. § 67.2 (1981).

An applicant seeking rehabilitation certification for a planned rehabilitation project was directed to submit a description of the proposed project and any work in progress. Such plans would then be reviewed for conformity to the "Standards for Rehabilitation" established by the regulation. 36

1. Section 67.6 set forth the procedures for certification application, in pertinent part, as follows:

Property owners desirous of having rehabilitations of certified historic structures certified by the Secretary as being consistent with the historic character of the structure or district in which the structure is located, thus qualifying as "certified rehabilitations," shall comply with the following procedures:

(a) Complete Part 2 of the "Historic Preservation Certification Application" and submit it to the SHPO. The application may describe a proposed rehabilitation project, work in progress, or a completed rehabilitation. In all cases, however, photographs showing the appearance of the structure prior to rehabilitation, both on the exterior and on the interior, must accompany the application. Other documentation, such as sketch plans and elevation drawings, may be necessary to evaluate certain rehabilitation projects. Where such documentation is not provided, review and evaluation cannot in some cases be completed. Owners who undertake rehabilitation projects without prior approval from the Secretary do so at their own risk.

(b) If the work described in Part 2 of the application form is not completed, the appropriate SHPO shall review the proposed project as to whether or not the project is likely to meet the Secretary of the Interior's "Standards for Rehabilitation" and forward the application and written within 45 days of receipt of the documentation detailed in paragraph (a) of this section.

(c) Upon receipt of the application describing the proposed project and the recommendation of the SHPO, the Secretary shall determine, normally within 45 days, if the proposed project does not meet the "Standards for Rehabilitation." If the proposed project is consistent with the "Standards for Rehabilitation," the owner shall be advised of necessary revisions to meet such standards and be encouraged to work with the SHPO to bring the

C.F.R. § 67.6(c) (1981). If the proposal comported with these regulations, a conditional approval would be issued which could be made final upon completion of the project if, as finished, it continued to meet the standards for rehabilitation. 36 C.F.R. § 67.6(e)–(g) (1981). Responsibility was placed upon the applicant to keep DOI informed of any substantive changes to the plan made during the course of the rehabilitation. 36 C.F.R. § 67.6(d) (1981).[1]

Section 67.7 of the regulations set forth the standards by which a rehabilitation would be evaluated to determine whether certification should issue. Applicants were advised, in pertinent part, that:

project into conformance. These notifications will be made in writing.

(d) Once a project has been approved, substantive changes in the work as described in the application should be promptly brought to the attention of the Secretary by letter to insure continued conformance to the Standards: such changes do not require a new "Historic Preservation Certification Application."

(e) When the rehabilitation project has been completed, the owner shall notify the appropriate SHPO in writing of the project completion date and shall sign a statement that, in the owner's opinion, the completed rehabilitation meets the Secretary's "Standards for Rehabilitation" and is consistent with the work described in Part 2 of the "Historic Preservation Certification Application." At this time the owner will be requested to provide photographs of the completed rehabilitation project; other documentation that the SHPO believes is necessary to make a recommendation to the Secretary; and his social security or taxpayer identification number. Certifications will be issued to rehabilitations which have been carried out in accordance with the proposed plans previously approved by the Secretary.

(f) The SHPO shall forward his recommendations as to certification to the Secretary within 45 days of receipt of the project completion date and documentation described in paragraph (e) of this section.

(g) The completed project may be inspected by an authorized representative of the Secretary to determine if the work meets the "Standards for Rehabilitation." The Secretary reserves the right to make inspections at any time after completion of the rehabilitation and to withdraw certification of the rehabilitation upon determining that the project does not meet or no longer meets the Secretary's "Standards for Rehabilitation" as completed. 36 C.F.R. 67.6 (1981).

(1) Every reasonable effort shall be made to provide a compatible use for a property which requires minimal alterations of the building structure, or site and its environment, or to use a property for its originally intended purpose.

(2) The distinguishing original qualities of character of a building, structure, or site and its environment, shall not be destroyed. The removal or alteration of any historic material or distinctive architectural features should be avoided when possible....

(4) Changes which may have taken place in the course of time are evidence of the history and development of a building, structure, or site and its environment. These changes may have acquired significance in their own right, and this significance shall be recognized and respected....

(9) Contemporary design for alterations and additions to existing properties shall not be discouraged when such alterations and additions do not destroy signficant historical, architectural, or cultural material, and such design is compatible with the size, scale, color, material, and character of the property, neighborhood or environment.

(10) Wherever possible, new additions or alterations to structures shall be done in such a manner that if such additions or alterations were to be removed in the future, the essential form and integrity of the structure would be unimpaired.

The regulations offered insight into how the standards would be used: "[They] shall be applied taking into consideration the economic and technical feasibility of each project: in the final analysis, however, the rehabilitation must be consistent with the historic character of the structure and/or the district in which it is located." 36 C.F.R. § 67.7(a) (1981).

In moving for summary judgment, plaintiff asserts that defendant invalidly employed a criterion not encompassed by these standards to deny certification for the College Building, namely, the effect of adjacent new construction upon a certified historic property. Pointing to language used in various standards, defendant argues that the standards clearly encompass not only the rehabilitation of an historic structure *per se,* but also its site and environment. For example, standard two provides: "[t]he distinguishing original qualities or character of a *building, structure, or site and its environment,* shall not be destroyed...." (emphasis added). Defendant asserts that use of this phrase, which is reiterated in many of the standards, demonstrates that DOI intended to examine areas beyond the structure itself in determining the acceptability of a rehabilitation project. Review would thus extend to a building's site and environment.

In reponse, plaintiff contends that the words building, structure and site are used as terms of art, the definitions of which are found in other regulations issued by the Department of the Interior, specifically those dealing with the National Register Program established by the National Historic Preservation Act of 1966, 80 Stat 915, 16 U.S.C. § 470a. The National Historic Preservation Act authorizes the Secretary of the Interior to "maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history...." 16 U.S.C. § 470a(1)(A). Pursuant to this authority, DOI promulgated regulations implementing the statute. Relying upon the principle that statutes and regulations promulgated by the same authority and relating to the same subject matter are to be read together with consistent meanings, see Sutherland Stat. Const. § 51.02 (4th Ed.), plaintiff urges that the word "site" in the regulations at issue should be given the same meaning assigned to that term in the National Register regulation. The Court disagrees. While later versions of the National Register regulations do contain a specific definition for the term "site", see e.g. 36 C.F.R. § 60.3 (1984), the regulations in effect in 1981 contained no such definition. 36 CFR § 60 et seq. Hence, the Court adheres to the maxim that words in a statute are generally to be accorded their ordinary meaning. *Reed v.*

*Health and Human Services,* 774 F.2d 1270, 1274 (4th Cir.1985).

Thus, the Court must examine the import of the oft repeated phrase "building, structure, or site and its environment" to determine whether it was intended to encompass new construction adjacent to, or connected with, a certified historic structure. After a close reading of the regulations, the Court finds this phrase to be ambiguous. As punctuated, it appears that the word "environment" refers only to "site" and not to "building" or "structure". DOI's decision in the case at bar, as well as the affidavit of a National Park Service official, reveal that the agency itself has, however, consistently interpreted its regulations as embracing new construction in the immediate vicinity of an historic structure. *See* Declaration of H. Ward Jandl. In light of the well-established principle that courts should defer to an agency's interpretation of its own regulations, if that interpretation is reasonable, *Monger v. Bowen,* 817 F.2d 15, 18 (4th Cir.1987), *Hunter v. Director Office of Workers' Compensation,* 803 F.2d 800 (4th Cir.1986), the Court declines to construe the statute on the basis of an errant comma, but looks instead to the reasonableness of the agency's interpretation to determine the meaning of the contested regulations.

Upon reviewing the regulations and the material referenced therein as a whole, the Court finds that the agency's interpretation is not only reasonable, but inescapable. While the wording of the standards may leave some doubt as to the scope of the rehabilitation review, any ambiguity is dispelled by consulting an additional publication referenced in, and recommended for use by the regulations. Section 67.7(b) notes that "[g]uidelines and other technical information to help property owners formulate plans for the rehabilitation, preservation and continued use of historic properties consistent with the intent of the Secretary's 'Standards for Rehabilitation' are available from the National Park Service...." The version of this publication available to plaintiff at the time the Charles College project was launched stated specifically,

The following guidelines are designed to help individual property owners formulate plans for the rehabilitation, preservation, and continued use of historic buildings consistent with the intent of the Secretary of the Interior's "Standards for Rehabilitation." The guidelines pertain to buildings of all occupancy and construction types, sizes, and materials. They apply to permanent and temporary construction on the exterior and interior of historic buildings as well as new attached or adjacent construction. (Defendant's Exhibit I).

The guidelines contain a direct discussion of the perils of undertaking new construction without DOI approval. Under the heading "new construction" on page 11, the guidelines recommend "keeping new additions and *adjacent new construction* to a minimum, making them compatible in scale, building materials, and texture." (emphasis added). Thus, the guidelines lend weighty support to the agency's interpretation of its regulations.

█ Subsequent amendments to the 1981 regulations also bolster this interpretation. In 1984, DOI issued revisions to § 67.6(b) in order to "clarify the scope" of rehabilitation review for certification purposes. 49 Fed.Reg 9303 (1984). These revisions made explicit what had formerly been implicit by stating that:

[A] rehabilitation project for certification purposes encompasses all work on the significant interior and exterior features of the certified historic structure(s) and its setting and environment, as determined by the Secretary, and related demolition, construction or rehabilitation work which may affect the historic qualities, integrity or setting of the certified historic structure(s). 36 CFR § 67.6(b) (1984).

The standards for review under the 1984 regulations remained unchanged. Thus, after viewing the regulatory scheme as a

whole, the Court finds that the 1981 regulations did encompass new construction.[2]

■ Next, the Court turns to Plaintiff's final argument that, in enacting regulations encompassing new construction, defendant exceeded its statutory grant of authority. As described above, 26 U.S.C. § 48(g)(2)(C) charges the Secretary of the Interior with certifying the rehabilitation of a certified historic structure "as being consistent with the historic character of such property...." A "certified historic structure" is in turn defined as "any building (and its structural components) ..." which meets certain historic criteria. 26 U.S.C. § 48(g)(3). Plaintiff argues that this statute restricts DOI inquiry to the actual historic structure, i.e., the building and its structural components.

Where a statute authorizes an agency to implement rules or regulations as may be necessary to carry out a delegated duty, "such regulations are to be sustained so long as they are 'reasonably related to the purposes of the enabling legislation', and are to be given consideration by a reviewing court." *United Hospital Center, Inc. v. Richardson,* 757 F.2d 1445, 1451 (4th Cir. 1985), quoting *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). "Moreover, in determining whether the regulations are within the purpose of the enabling legislation, the courts 'give great deference to the interpretation given the statute by the officers or agency charged with its administration.'" *Richardson,* 757 F.2d at 1451, quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

In this case, the Court finds that the regulations at issue fit neatly within the scope of the laws' purpose of encouraging investment and redevelopment of older properties while retaining their historic character. Thus, the Court holds that these regulations, as they apply to rehabili-

tation certification, are within the Secretary of the Interior's statutorily granted authority.

For all of the above stated reasons, defendant's Motion for Summary Judgment will be granted.

---

**2.** Plaintiff asserts that, even if new construction was included in the 1981 regulations, due to the ambiguity of those rules, defendant ought to be estopped from denying certification based upon new construction. Estoppel, however, requires the making of a definite misrepresentation of fact with reason to believe another will rely upon it. When a party seeks to assert estoppel against the government, this misrepresentation must amount to "'affirmative misconduct'", and "more than a mistake." *Furcron v. United States,* 626 F.Supp. 320, 323 (D.Md.1986). Plaintiff has alleged no such facts upon which estoppel may be based in this case.