**Harbinder Dhariwal SINGH,
Petitioner–Appellant,**

v.

**Janet RENO, Attorney General; Thomas J. Schiltgen, District Director of Immigration and Naturalization Service, San Francisco, California; Immigration And Naturalization Service, Respondents–Appellees.**

No. 96–16373.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 1997.

Decided May 27, 1997.

qualified experts.  *See Greenpeace,* 14 F.3d at   1332–33.

Ira E. Bank, Law Offices of Ira E. Bank, Los Angeles, California, for petitioner-appellant.

Robert Yeargin, Assistant United States Attorney, San Francisco, California, for respondents-appellees.

Before: REINHARDT, HALL, and THOMPSON, Circuit Judges.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge.

Harbinder Dhariwal Singh, a citizen of India, obtained lawful permanent resident status in the United States on December 1, 1990 as a special agricultural worker. From that date to the onset of these proceedings, he has spent less than one-third of his time in the United States. Singh arrived in San Francisco on July 8, 1993 from Great Britain, where he simultaneously enjoyed permanent resident status. Upon arrival, he was placed in exclusion proceedings as an alien not in possession of a valid immigrant visa.

The Immigration and Naturalization Service ("INS") contends that Singh abandoned his permanent resident status through his extended time abroad and his minimal contacts in this country. After an evidentiary hearing, the Immigration Judge ("IJ") ordered Singh excluded. Singh appealed to the Board of Immigration Appeals ("the Board") which upheld the IJ's decision for the reasons stated therein. He then petitioned for a writ of habeas corpus to the United States District Court for the Northern District of California. That petition was denied on July 23, 1996, and this appeal followed.

The district court had jurisdiction to review the final order in habeas corpus proceedings. 8 U.S.C. § 1105a(b).[1] We review the final order of the district court pursuant to 28 U.S.C. § 2253. Singh spent a minimal amount of time in this country after receiving his permanent resident status, and he established neither a home nor employment of any permanence whatsoever. We therefore affirm the district court.

## I.

The district court review was "limited to whether the Board's findings of fact were supported by substantial evidence and whether the Board's decision was arbitrary, capricious, an abuse of discretion, or contrary to law." *DeBrown v. Department of Justice*, 18 F.3d 774, 777 (9th Cir.1994). The Board adopted the IJ's findings and conclusions in this case, however, so the district court focused on the underlying decision of the IJ. *See Mabugat v. INS*, 937 F.2d 426, 430 n. 2 (9th Cir.1991).

■ This court reviews de novo the district court's denial of the petition for a writ of habeas corpus. *Chen v. INS*, 95 F.3d 801, 804 (9th Cir.1996). This court therefore conducts the same inquiry as the district court and reviews the underlying factual findings for substantial evidence as well. *Chavez–Ramirez v. INS*, 792 F.2d 932, 934–35 (9th Cir.1986). To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the facts were as the alien alleged. *INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992).

## II.

■ When an applicant has a colorable claim to returning resident status, as Singh does, the INS has the burden of proving he is not eligible for admission to the United States. *See Landon v. Plasencia*, 459 U.S. 21, 35, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1982). The INS' burden, therefore, is to establish by clear, unequivocal, and convincing evidence that Singh's status has changed. *Woodby v. INS*, 385 U.S. 276, 277, 87 S.Ct. 483, 484, 17 L.Ed.2d 362 (1966). "[I]n order to qualify as a returning resident alien, an alien must have acquired lawful permanent resident status in accordance with our laws, must have retained that status from the time he acquired it, and must be returning to an 'unrelinquished lawful permanent residence' after a 'temporary visit abroad.'" *Matter of Huang*, 19 I. & N. Dec. 749, 753 (1988) (quoting *Santos v. INS*, 421 F.2d 1303, 1305 (9th Cir.1970)).

■ The crucial inquiry is whether Singh's extended trips constitute "temporary visits abroad." "Temporary" in this context is not merely an antonym of "permanent." A trip is a "temporary visit abroad" if (a) it is for a "relatively short" period, fixed by some early event; or (b) the trip will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time. *Chavez–Ramirez*, 792 F.2d at 936–37. Singh's trips abroad, sometimes eight or nine months in consecutive duration, could not be described as "relatively short."

■ If the alien's trip abroad is not "relatively short," it is a "temporary visit abroad" only if the alien has "a continuous, uninterrupted intention to return to the United States during the entirety of his visit." *Id.* at 937. The relevant intent is not the intent to return ultimately, but the intent to return to the United States within a relatively short period. *Id.* In sum, a legal permanent resident may plan only a relatively short trip. He may extend his trip beyond that relatively short period only if he intends to return to the United States as soon as possible thereafter.

■ Factors to be considered in evaluating the intent of the alien include: the alien's family ties, property holdings, and business affiliations within the United States,

---

**1.** 8 U.S.C. § 1105a was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009, which President Clinton signed into law on September 30, 1996. The repeal only applies to final orders of deportation or removal and motions to reopen that are filed on or after that date.

and the alien's family, property, and business ties in the foreign country. *Id.* An alien's desire to retain his status as a permanent resident, without more, is not sufficient; his actions must support his professed intent. *Huang,* 19 I. & N. Dec. at 753.

■ Singh's few established connections to the United States, despite over two and a half years of legal permanent resident status, clearly and convincingly demonstrate his lack of an intent to reside in the United States. Singh's close ties to his immediate family— his wife and daughter who reside abroad— were the proffered reasons for his extensive absences from this country. Although their pending Family Based immigrant visa petition filed by Singh in 1992 prevented them from residing in the U.S. as immigrants, they were free to visit. Singh's decision to spend most of his time abroad is evidence of his lack of ties to the United States.

Nor does Singh's employment history provide any evidence of an intent to reside permanently in the United States. Although Singh attained his permanent resident status as a special agricultural worker, he quickly changed careers. Singh worked at a restaurant in Carmel, California, but his long absences from the country were such that his employment history was sporadic. When working at the restaurant, Singh lived in housing provided by his employer. He never established his own residence in the United States during his entire time as a permanent legal resident.

Furthermore, Singh's dealings with immigration procedures are further evidence that he did not intend to reside permanently in this country. Singh listed an address in England as his permanent address on his replacement Indian passport, issued less than two months after attaining permanent resident status in the United States. One month later, Singh applied for and received a visitor's visa at the U.S. consulate in London. In his consular interview for that visa, Singh did not raise the issue about his permanent residence status. Singh used that visa to enter the U.S. four times, even though a permanent resident does not require such a visa. *See Chavez–Ramirez,* 792 F.2d at 934. On Singh's last visit to the United States, he checked "NO" when asked if he resided permanently in this country, checked "PLEASURE" for the purpose of his visit, and wrote that he expected to stay 3 weeks. Singh was a seasoned world traveler who had successfully secured permanent resident status in both the U.K. and the U.S. The above events cannot all be classified as inadvertent. Rather, the IJ reasonably concluded that they were evidence that Singh did not intend to remain a permanent resident of the United States.

Determining an alien's intent is an essentially factual inquiry, *see id.,* and the facts of this case do not show the requisite intent necessary for an alien to maintain his permanent resident status. Singh attained that status on December 1, 1990. It is unclear where he was until March 13, 1991 when he entered the United States from Vancouver, B.C. He spent most of the next three months in the United States and then departed for the United Kingdom on June 20, 1991. Singh did not return to the United States until *nine months later* on March 23, 1992. He remained almost four months and then returned to the United Kingdom on July 17, 1992. He did not return to the United States until *almost eight months later* on March 8, 1993. In sum, after attaining permanent resident status on December 1, 1990, Singh spent only 185 out of the next 829 days (22%) in the United States.[2] Furthermore, in the brief periods Singh spent in the United States he neither maintained his own residence, nor a job of any permanence.

Singh's pattern, therefore, was to live abroad most of the year and to spend his summers working in California and living in a dwelling furnished by his employer. Several cases have held that aliens relinquish their permanent resident status in directly analogous circumstances. *See, e.g., Alvarez v. District Director,* 539 F.2d 1220, 1222 (9th

---

**2.** Although his most recent trip abroad was less than a month, Singh abandoned his legal permanent resident status long before with his extensive trips abroad. *See Kane,* 15 I. & N. Dec. at 265 (alien abandoned permanent resident status in 1967 despite making several more trips to the U.S. until 1972).

Cir.1976) (alien relinquished permanent resident status despite spending two or three consecutive months living in the U.S. and staying with friends); *Angeles v. District Director*, 729 F.Supp. 479, 481 (D.Md.1990) (10– to 11–month annual absences and residing at relative's home in U.S.); *Huang*, 19 I. & N. Dec. at 750 (11–month annual trips abroad and residing at relative's home while in U.S.); *Kane*, 15 I. & N. Dec. at 258 (11–month annual absences from U.S. and residing in rented furnished home while in U.S.). Singh made long trips abroad of nine months and almost eight months, without any residence or employment of any permanence to return to. The slight difference in the duration of Singh's long trips abroad and those in the above cases does not convert Singh's extensive absences to "temporary visits abroad."

The INS argues that these activities are consistent with those of a nonimmigrant visitor for business and we agree. The evidence clearly shows a visitor who spent a sporadic amount of time in the United States until he could establish a permanent residence in this country "at some indefinite time in the possibly distant future." *Angeles*, 729 F.Supp. at 484. Singh spent his summers in California, but spent the vast majority of his time abroad in anticipation of his wife and daughter attaining legal immigrant status. These visits do not qualify as "temporary" and, by making them, Singh abandoned his legal permanent residency in the United States. *See Huang*, 19 I. & N. Dec. at 756 (permanent residency relinquished when family lived in Japan while waiting for husband to finish doctoral studies so they could all move to the United States); *see also Angeles*, 729 F.Supp. at 481 (alien not permitted to spend a month or two annually in the U.S. with the intention of retaining permanent resident status); *Kane*, 15 I. & N. Dec. at 258 (same).

The district court's denial of the petition for writ of habeas corpus is AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

I dissent. Never before have we held that a lawful permanent resident forfeits his basic and precious right to live and work in this country if he engages in innocent, well-intentioned, and temporary absences—in this case, spending time abroad with his wife and young child while waiting for the INS to grant the visa petition that would allow them to join him here. Contrary to the majority's assertion, no prior case even remotely suggests, let alone compels, this result.

It is undisputed that Singh lawfully obtained permanent resident status in this country, worked and invested large sums of money in this country, spent a substantial and ever-increasing amount of time in this country, and filed an immigrant visa petition so that his family could join him in this country. Yet the majority holds that his decision to spend a reasonable amount of time each year with his wife and daughter while they were awaiting approval of their petition—one that he filed for the very purpose of reuniting his family in this country—is "clear, unequivocal, and convincing evidence" that he lacked the intent to make the United States his home. On that basis, the majority upholds the BIA's decision forfeiting his permanent resident status.

The majority severely penalizes Singh for attempting to fulfill his responsibilities as a father and husband during the time when his family was not yet permitted to join him in the United States, and it ultimately uses his clearly manifested desire to be with his family as clear, unequivocal, and convincing evidence that he lacked the intent to live here with them. In sum, Singh has lost his right to live in this country because he refused to shirk his familial duties while waiting for his wife and child to receive permission to join him here. This paradoxical result is shameful and wholly unprecedented.

The majority correctly acknowledges that the determinative question in this proceeding is that of Singh's intent. It does not dispute that Singh was awaiting "the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time," *Chavez–Ramirez v. INS*, 792 F.2d 932, 937 (9th Cir.1986)—namely, the approval of the immigrant visa petition that he had filed on behalf of his wife and daughter. Therefore, as the majority's opinion makes clear, Singh may not be found to have relinquished his permanent resident status if he main-

tained "a continuous, uninterrupted intention to return to the United States" during his time abroad. *Id.* at 937.

The majority also recognizes that the government has the burden of showing by "clear, unequivocal, and convincing evidence" that Singh has forfeited his hard-won status. *Woodby v. INS*, 385 U.S. 276, 277, 87 S.Ct. 483, 484, 17 L.Ed.2d 362 (1966). Oddly, we are supposed to determine whether the government met this heavy evidentiary burden by applying a substantial evidence standard. *Chavez–Ramirez*, 792 F.2d at 934–35. Wending one's way through the tortured and artificial analytical process one must follow in order to try to determine whether there is (1) "substantial evidence" of (2) "clear, unequivocal, and convincing evidence" of (3) the ultimate finding necessary to support the forfeiture of Singh's rights, it is virtually impossible to conclude that the government has met its burden of showing that Singh failed to maintain the requisite intent to return to this country permanently.

The time that Singh spent abroad was, by the majority's own description, "in anticipation of his wife and daughter attaining legal immigrant status." His absences thus demonstrated not a *lack* of intent to return, but precisely the opposite: a desire to fulfill his obligations as a husband and father, coupled with an intent to return to the United States with his family upon INS approval of the petition that would have permitted them to live here together as a family unit. The Singh family's cherished goal was to immigrate here and to live in this country permanently, and nothing Singh did in any way suggested a lessening, let alone an abandonment, of his intent to return to the United States. Moreover, as the government concedes and the majority acknowledges, any misrepresentations or omissions by Singh related to his unnecessary use of a visa and his erroneous answers on a customs declaration form are not grounds for forfeiture of his permanent resident status: their relevance, if any, is solely as evidence of whether he actually harbored a continuous and uninterrupted intention of returning to the United States. In this case, it is absolutely clear that the circumstantial evidence regarding the use of an unnecessary visa and answers on a customs declaration does not overcome the basic fact that Singh was simply awaiting the approval of the immigrant visa petition that he had filed on behalf of his family.

The majority summarizes the rationale by which it justifies its holding in the last two sentences of its opinion. There, it states: "Singh spent his summers in California, but spent the vast majority of his time abroad in anticipation of his wife and daughter attaining legal immigrant status. These visits do not quality as 'temporary' and, by making them, Singh abandoned his legal permanent residency in the United States." The visits the majority is referring to are the nine months he spent with his family the first year, and the less than eight months he spent with them the next. To hold that Singh's spending these amounts of time with his wife and newborn child, while awaiting the granting of permission for them to reside in this country with him permanently, demonstrates by "clear, unequivocal, and convincing evidence" that he abandoned his intention to reside here permanently himself is beyond my comprehension.

To bolster its opinion, the majority appears to argue that because his wife and daughter were "free to visit" the United States, Singh should have insisted that they come here if he wanted to spend time with them, and that by flying to see them instead of ordering them to visit him, he demonstrated his intent not to return even after their petition was approved. Again, the majority's reasoning defies explanation. As my colleagues acknowledge, Singh's wife and daughter were *not* free to reside here and, unless the intent of the majority is to encourage visitors to abuse their status, overstay their welcome, and invite involuntary deportation, the family had good reason *not* to spend too much time in this country in unlawful *de facto* residence while awaiting approval of their immigrant visa petition. Moreover, Singh's wife had a job in the United Kingdom that provided the family with regular income, and she could not both have held that job and visited the United States for significant periods of time, particularly as she would not have been permitted to work here during those visits. Singh, by contrast, faced no such limitations on his ability to spend time abroad, and was able to

find the kind of work here that permitted him to spend time with his family. Finally, there were particularly compelling reasons for Singh to visit his family initially, and to spend a reasonable amount of time doing so: Singh's daughter was only an infant at the start of the period in question—she was born in 1990, the year that Singh lawfully obtained permanent resident status—and his wife was in poor health following childbirth.

In my view, the law does not require someone in Singh's circumstances to choose between shirking his family responsibilities by becoming a wholly absentee husband and father, and jeopardizing his status as a lawful permanent resident. Only by ignoring Singh's actual and objectively demonstrable intent can the majority arrive at the legal fiction that his travels were "consistent with those of a nonimmigrant visitor for business," and that substantial evidence supports the conclusion that the INS has shown by "clear, unequivocal, and convincing evidence" that he intended to abandon his permanent resident status.[1]

The majority also asserts that "[s]everal cases have held that aliens relinquish their permanent resident status in directly analogous circumstances." This is plainly incorrect. None of the meager authority cited by the majority even purports to address the situation of a permanent resident who has taken steps to bring his family to the United States legally, and whose time abroad is spent with them during the period they are awaiting official approval of their visa peti-tion. Nor do any of the cases cited by the majority support the proposition that a lawful permanent resident who spends a substantial and ever-increasing portion of his time in the United States—including well over half of his time during the applicable part of the calendar year in which the INS first questioned his intentions[2]—is present only on a "sporadic" basis. Those cases in which we have held that a permanent resident's absence was more than "temporary" in nature have all involved absences of much greater permanence that were unbroken by substantial stays in the United States. *See, e.g., Chavez–Ramirez,* 792 F.2d at 933–34 (alien resided continuously in Mexico for six years, during which time she never returned to the United States, but married a Mexican and gave birth to a child in Mexico); *Santos v. INS,* 421 F.2d 1303, 1303–05 (9th Cir.1970) (permanent resident of Guam left to take "a better job elsewhere" and remained absent for eight years except for three occasions on which his ship docked in Guam); *Gamero v. INS,* 367 F.2d 123 (9th Cir.1966) (alien remained in Mexico for more than seventeen years).

The only decision of this court that the majority offers as support for its position, *Alvarez v. District Director,* 539 F.2d 1220 (9th Cir.1976), is a far cry from the present case. In *Alvarez,* we held that an alien who "never relinquished her employment in the Philippines" but continued to work there "to increase her retirement annuity" had abandoned her permanent resident status. *Id.* at

---

1. Equally unjustifiable is the majority's characterization of Singh as a "seasoned world traveler" who secured permanent resident status here by cunning and deceit. To the contrary, it is obvious that Singh was an untutored and naive person who could only have harmed his own cause by identifying himself repeatedly to the INS as a visitor, but nevertheless did so out of ignorance of his rights and an overabundance of caution. The majority insists that his actions "cannot all be classified as inadvertent," yet fails to explain how those actions could possibly be viewed as strategic or self-serving in any way.

2. The immigration judge made no findings as to where Singh spent the last month of 1990 after receiving permanent resident status, but deemed it "likely" that Singh was "in the United Kingdom on January 1, 1991." Considering the period from January 1, 1991 through July 3, 1993—the date on which the INS initiated these exclu-sion proceedings—the immigration judge found that Singh was present in the United States for 68 days in 1991; 117 days in 1992; and 102 days over the first *half* of 1993.

While acknowledging that Singh's most recent trip lasted for "less than a month," the majority confidently pronounces that he forfeited his rights "long before" as a result of his "extensive trips abroad." It then identifies only two such trips—a nine-month trip beginning in June of 1991, and a trip of less than eight months beginning in July of 1992. Even if these trips form the sole basis for forfeiture of Singh's rights, however, his pattern of ever-increasing presences in this country is relevant as evidence of his intent from the outset to make this country his home. Indeed, the district court deemed it "not unreasonable" to conclude that this "pattern of increasingly lengthy stays in the country indicates an intent to make the United States his permanent home."

1222, 1225. In concluding that she had chosen neither to work nor to reside permanently in the United States, we also relied on the fact that over the course of three and a half years, she spent a *total* of approximately three months in this country; that she had *never* worked in this country; and that her "yearly trips" here were "for the avowed purpose of keeping her alien registration card current." *Id.* at 1222–24. By contrast, Singh has spent a much greater, and ever-increasing, amount of time here; he has not done so simply in order to maintain his permanent resident status; he worked in the United States after he obtained permanent resident status; he has not worked in any country other than the United States since

that time; and his absences were for the purpose of visiting with his wife and child pending approval of the visa petition that would have permitted his family to be reunified in this country. The remaining cases cited by the majority—a decision of a district court from another circuit, and two decisions of the BIA itself—are hardly controlling authority in this circuit and, in any event, an examination of the facts in the three cases reveals that they offer even less support for the majority's position.[3]

The right to live and work in the United States is a precious one. It is undisputed that Singh obtained that right lawfully, and that he did all within his power to obtain the same opportunity for his family. During the

**3.** *Matter of Kane*, 15 I & N. Dec. 258, Interim Decision No. 2371 (B.I.A.1975), concerned a native and citizen of Jamaica who had been living in Jamaica for six years in an eight-room house that she owned and operated as a lodging house. Each year, she would visit the United States for one month not to live or work here, but to preserve her permanent resident status. *Id.* The Board concluded that she had "been living in Jamaica indefinitely," and that her absences could not be deemed "temporary." *Id.* at 265. *Matter of Huang*, 19 I. & N. Dec. 749, Interim Decision No. 3079 (B.I.A.1988), concerned an alien who attempted to reenter the United States with her two children after living in Japan for nearly four years. When she obtained permanent resident status, the alien and her two children stayed in the United States "for approximately 3 to 4 weeks" and then joined her husband in Japan, where he had contracted with a university to study and work as a neurosurgeon. *Id.* at 750. She and the children returned to the United States for three or four weeks each spring not to live or work here, but solely in order to maintain her permanent resident status. *Id.* The family owned a home in Japan and had never maintained a residence in the United States; the children were attending school in Japan. The Board concluded that the alien's absences were not "temporary" and rejected the argument that her period of absence was fixed by her husband's completion of his studies, on the ground that the record failed to indicate a "clear demarcation as to when her husband's relationship with the university would end." *Id.* at 756. Both of these BIA decisions involved aliens who had been living and working in another country for a period of years. Moreover, their presences in the United States amounted to a month or less each year and were intended simply to support the pretext that they remained permanent residents. There was no specific event that would serve to terminate their residence abroad and cause them unqualifiedly to return here. By contrast, Singh spent

a third of his time living and working in the United States and has not worked in any other country since obtaining permanent resident status. Furthermore, it is clear that Singh did not maintain his presence here simply to create a pretext of being a permanent resident. Indeed, the opposite appears to be true: he obtained a visitor's visa and identified himself on a customs declaration form as a visitor—painfully guileless acts for someone who intends merely to build an administrative record that he is a permanent resident—but then behaved like a permanent resident once inside the country by obtaining employment. He was waiting only for the single event of our government's approval of his family's visa petition—before bringing them here as well.

The last of the cases cited by the majority, *Angeles v. District Director*, 729 F.Supp. 479 (D.Md.1990), is not only factually distinguishable, but also directly contrary to the law of this circuit. In that case, the district court for the District of Maryland upheld the exclusion of a native Filipino who had spent nearly nine years in the Philippines caring for her ailing parents. Even after the death of her mother, the alien remained in the Philippines because her father, who "wished to be near his wife's grave," "was depressed and unwilling to move to the United States." *Id.* at 481. Because she did not wish to lose her status as a permanent resident, she would visit the family home in Maryland for one or two months each year. *Id.* A nine-year absence from the United States is, of course, far longer than the two-and-a-half year period at issue in the present case. Moreover, Singh's presence was far more substantial and continued to increase over time, and as noted above, he engaged in work here. I would reject *Angeles* entirely, however, on the ground that it is simply wrong. The district court reasoned that "[i]n order to exercise the privilege of leaving temporarily, an alien must have a United States residence on return." *Id.* at 483. It is well established, however, that "an immigrant is not

period in question, he was patiently waiting for the INS to approve their visa petition. I do not believe, and the INS does not contend, that he could have forfeited his permanent resident status simply by virtue of a few erroneous or inaccurate statements. To the contrary, the dispositive question is whether Singh forfeited that status by spending what the majority deems to be too much time with his family. I would hold that he did not. Singh's demonstrated and unwavering intent to bring his family to the United States, plus the fact that he lived and worked here for increasing periods of time after obtaining permanent resident status, preclude the BIA from determining by clear, convincing, and unequivocal evidence that he did not intend to make the United States his home. Accordingly, I would reverse the judgment of the district court and grant the writ of habeas corpus.

required to maintain a permanent residence in the United States in order to have permanent residence status." *Alvarez,* 539 F.2d at 1224. It is permanent resident status that confers "the *privilege* of establishing a permanent residence in the United States." *Saxbe v. Bustos,* 419 U.S. 65, 72, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974). *Angeles* is also inconsistent with the law of this circuit because it does not even purport to apply our rule that a trip is a "temporary visit abroad" if it "will terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time." *Chavez–Ramirez,* 792 F.2d at 937. The district court found "substantial evidence that her visits would not have terminated until her father passed away or chose to and could lawfully emigrate to the United States." Instead of considering whether there was a reasonable possibility that her "aged and ill" father would soon pass away and that her trip might therefore be temporary, *id.* at 481, the district court simply cited the contingency of her father's death as evidence that her trip was *not* temporary. *Id.* at 484. Given both its inconsistency with the law of this circuit and its factual dissimilarity from the case at hand, *Angeles* does not provide much comfort or support to the majority.