*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SAMIRA G. HANA,

*Petitioner,*

*v.*

No. 03-3771

ALBERTO GONZALES, Attorney General,

*Respondent.*

---

On Petition for Review from an Order of the
Board of Immigration Appeals.
No. A43 507 229.

Submitted: November 3, 2004

Decided and Filed: March 14, 2005

Before: MARTIN and BATCHELDER, Circuit Judges; JORDAN, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Namir M. Daman, DAMAN & DAMAN, Oak Park, Michigan, for Petitioner. M. Jocelyn Lopez Wright, David V. Bernal, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. Samira G. Hana ("Hana"), a 59-year-old woman from Iraq who was granted lawfully admitted permanent resident ("LPR") status in 1992, petitions for review of an order of the Board of Immigration Appeals ("the Board") reversing the decision of the Immigration Judge ("IJ") terminating exclusion proceedings against her. In sustaining the appeal of the Immigration and Naturalization Service ("INS"),[1] the Board determined that the IJ erred in

---

[*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

[1]On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice, and its functions were transferred to the newly formed Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. § 101, *et seq.*). Because most of the proceedings in this case took place before this change occurred, we refer throughout this opinion to the INS as the relevant government actor.

finding that Hana did not abandon her LPR status in the United States by spending the bulk of her time in Iraq over a four-and-a-half-year period. Because the record compels a finding that there is insufficient evidence to support a determination that Hana abandoned her LPR status, we grant the petition for review and vacate the Board's order of removal.

## BACKGROUND

On May 22, 1992, Hana was granted LPR status pursuant to a petition filed in 1981 by her brother, who was himself a United States citizen. Hana immediately filed immigrant petitions for her husband and four children. She testified that she was told that her children would be granted visas within three years.

On July 26, 1992, after two months in the United States, Hana returned to Iraq, and to her job as an inspector at the Central Bank of Iraq—a government job under the regime of Saddam Hussein. Hana testified that she returned to Iraq to work "because they notify people when they have to return in the newspaper. And if one doesn't return, they will hurt their children or their family." She also testified that she could not tell her Iraqi employer that she was emigrating to America because if she did "they wouldn't allow [her] to leave."

In October 1994, Hana returned to the United States with an INS-issued multiple-entry re-entry permit that was valid until October 26, 1994. Hana testified that when she left Iraq in 1994, it was her intention not to leave the United States again, but to wait here for her children to emigrate from Iraq. Hana also testified that she brought with her from Iraq over $10,000 in gold jewelry and money, which she gave to her brother in Michigan, so that she could purchase a home and a car and help provide for her children when they arrived in the United States. Hana nonetheless returned to Iraq in December 1994, in response to repeated telephone calls from her husband stressing her mother-in-law's critical health condition. Before leaving for Iraq, Hana obtained another re-entry permit valid until December 28, 1996.

Upon returning to Iraq in 1994, Hana resumed her employment at the Central Bank. She testified that she had not planned to return to work in Iraq in 1994, but that she did because "they contacted me to return to work and I am afraid to refuse because maybe the security agents would come, they'd come and they'd hurt my children, my daughters." Hana also testified that she worked to help out with the cost of living. Hana testified that she attempted to return to the United States in January of 1996 (nearly a year before the expiration of her re-entry permit), but that when she "tried to leave at the border . . . they wouldn't allow [her]." According to Hana she did not attempt to return to the United States prior to January 1996 because she was waiting for her son, who finally arrived here in December 1995, and because of her mother-in-law's failing health.

Hana returned to the United States on December 13, 1996, roughly two weeks before her re-entry permit was set to expire. She was detained at JFK airport for questioning by INS agents. During the interview Hana stated that she was returning because her re-entry permit was about to expire and she "did not want to lose [her] green card." She also stated that she had a ticket for a return flight to Jordan in four months, but that she would not leave the United States unless she first obtained another re-entry permit. In answer to a question asking whether she ever intended to take up residency in the United States, Hana responded, "Yes, I go back because my children are there when they can come here I will stay. I petitioned for them in 1992."

During this interview Hana admitted that she had never worked in the United States, that she had worked in Iraq until tendering her resignation from the Central Bank in October 1996, that she had never paid income taxes in the United States, and that she owned no property in the United States. Based on these responses and the length of her absence from the United States, the INS

refused Hana's admission and charged her with excludability under 8 U.S.C. § 1182 (a)(7)(A)(i)(I) as an immigrant without a valid visa.

Hana requested a hearing, and on June 23, 1999, an IJ in Detroit, Michigan, after hearing the testimony of Hana and several of her relatives, issued an oral decision and order rejecting the INS's argument that Hana had relinquished her LPR status and terminating the exclusion proceedings. In so doing the IJ found Hana's trips to Iraq to be "temporary visit[s] abroad" under 8 U.S.C. § 1101 (a)(27)(A), thus leaving her LPR status intact. The INS appealed the IJ's decision to the Board, which issued an order sustaining the INS's appeal, vacating the IJ's decision, and ordering Hana deported to Iraq.

The Board's decision rested on its interpretation of the meaning of the term "temporary" in 8 U.S.C. § 1101 (a)(27)(A) and its application of that meaning to Hana's trips to Iraq. The Board acknowledged that "a temporary visit abroad cannot be defined in terms of elapsed time alone" and that "the intention of the alien, when it can be ascertained, will control." Nonetheless, the Board found that the IJ erred in finding that Hana had not abandoned her LPR status. The Board based this decision on the fact that Hana had lived in the United States for only a three-month period from July 1992 to December 1996, and that for the balance of this time she was living and working in Iraq, where her family, permanent employment, and property were located. The Board was also persuaded by the fact that Hana had no property, bank account, doctor, or driver's license in the United States, and that she had not paid taxes here. On this record, the Board determined that Hana's trips abroad were "not temporary within the meaning of the act," that Hana "remained in Iraq for her convenience and choice, that she was not compelled to remain, and that the [INS] has shown by clear, unequivocal, and convincing evidence that the applicant's prolonged departure from the United States constituted an abandonment of her lawful permanent resident status."

The Board ordered Hana deported to Iraq, and she timely appealed.

## ANALYSIS

On judicial review of an order of removal, the Board's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *See Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001) (quoting 8 U.S.C. § 1252 (b)(4)(B)). Under this deferential standard, we may not reverse the Board simply because we disagree with its understanding of the facts. *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001). Rather, we must find that the evidence compels a finding that the Board was wrong. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1, 483-84 (1992).

Although our deferential standard of review works against overturning the Board, the underlying burden of proof in this case has very much the opposite effect. "When an applicant has a colorable claim to returning resident status, as [Hana] does, the INS has the burden of proving [s]he is not eligible for admission to the United States." *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997) (citation omitted). That burden is "to establish by clear, unequivocal, and convincing evidence that [Hana's] status has changed." *Id.* (citing *Woodby v. INS*, 385 U.S. 276, 277 (1966)). Our task in this case, therefore, is to determine whether we are compelled to conclude that, contrary to the Board's finding, the record does not contain clear, unequivocal, and convincing evidence that Hana abandoned her LPR status in the United States *See Khodagholian v. Ashcroft*, 335 F.3d 1003, 1006 (9th Cir. 2003).

Hana was granted LPR status in 1992 and thus claims to be admissible to the United States as "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." 8 U.S.C. § 1101 (a)(27)(A); *see also* 22 C.F.R. § 42.22 (a) (defining "returning resident" aliens under 8 U.S.C. § 1101 (a)(27)(A) for immigrant visa purposes). This circuit has yet

to address in a published opinion the meaning of the phrase "temporary visit abroad." The Ninth Circuit, however, has defined it this way:

> A trip is a 'temporary visit abroad' if (a) it is for a relatively short period, fixed by some early event; or (b) the trip will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time.

*Singh*, 113 F.3d at 1514 (internal citation and quotation omitted). The Second Circuit has followed this standard as well, adding that when the visit "relies upon an event with a reasonable possibility of occurring within a short period of time . . . the intention of the visitor must still be to return within a period relatively short, fixed by some early event." *Ahmed v. Ashcroft*, 286 F.3d 611, 613 (2d Cir. 2002) (internal citation and quotation omitted). We have relied upon this standard in unpublished opinions, *see, e.g.*, *Ezenwafor v. Ashcroft*, 97 Fed.Appx. 29, 31 (6th Cir. 2004); *Ahmed v. INS*, 85 Fed.Appx. 426, 429 (6th Cir. 2003), and see no reason to depart from it.

We emphasize, however, that in determining whether an alien has abandoned her LPR status, we must take into account the totality of the alien's circumstances. While it is certainly proper to consider factors such as the location of the alien's family, property, and job, and of course the length of the alien's trip(s) abroad, we should be careful not to focus on these factors to the exclusion of other evidence in the record demonstrating the alien's intent with regard to maintaining her LPR status. Examined in this context, we are convinced that the evidence relied on by the Board is not sufficient to demonstrate that Hana did not have the requisite intent "to return [to the United States] within a period relatively short, fixed by some early event." *See Ahmed*, 286 F.3d at 613.

Upon obtaining LPR status for herself in 1992, Hana immediately filed immigration petitions for her husband and four children. She testified, and there is no evidence to the contrary, that she was told that her children would be granted visas within three years, and she was clearly under the impression that so long as she returned to the United States before the expiration of her re-entry permit, she could travel to Iraq to prepare her family members for their emigration and not risk losing her cherished LPR status. Part of that preparation included helping out with her sick mother-in-law and continuing her job at the Central Bank so that Saddam's henchman did not harm her family members on the eve of their emigration. Another component was transporting her valuables to America so that she could lay the foundation for her family's life in the United States. It is obvious that Hana's intent all along was to facilitate her family members' joining her in the United States within a few short years, not to throw away the LPR status that she had waited eleven years to obtain. Finally, it is certainly worth noting that Hana's efforts to bring her family to the United States were ultimately successful. As of the date of the hearing before the IJ, two of Hana's children and her husband had been admitted to this country on the basis of Hana's LPR status.

The Board was certainly correct in pointing out that during the four-and-a-half-year period in question Hana's permanent job, her real property, and her immediate family were all located in Iraq, and that she had never worked, paid taxes, or procured a bank account or driver's license in the United States. It is also important to take into consideration that Hana was absent from the United States for the vast majority of those years. While in many cases these factors would rightly counsel in favor of finding that an alien had abandoned her LPR status, they do not lead to that conclusion in this case, where it is clear that Hana's failure to put down roots in the United States was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law. The evidence in this record demonstrates that Hana's clear intent was "to return within a period relatively short, fixed by some early event"—the safe emigration of her family from Iraq, which she expected to occur anytime within three years. Indeed, to conclude—as did the Board—that Hana's absence from the United States for most of the period in question evidences her intent to abandon her permanent resident status in the United States would require us also to conclude that Hana intended that her

family should become permanent residents here without her.  Nothing in this record supports such a conclusion.

Although the Ninth Circuit's decision in *Singh* is not binding on this court, our distinguishing it will help to emphasize our point that the alien's intent cannot be examined in a vacuum that turns a blind eye to the circumstances he faces.  Singh obtained LPR status in 1990 and then spent the better part of the next two and a half years in Great Britain visiting his wife and child, whose immigration petitions were pending in the United States at the time.  While Singh's wife and child could not reside in the United States while their petitions were pending, they were free to visit here, yet Singh still chose to spend the bulk of his time in Great Britain.  In fact, Singh held permanent resident status in Great Britain during the same time he held that status in the United States.  Unlike Singh, who was traveling freely between two relatively safe democratic nations, Hana was acting to protect her family from a dictatorial regime with an infamous human rights record.  Although we view *Singh* as a close case, especially given the INS's heavy burden in proving abandonment, it is clearly distinguishable from Hana's situation in at least this one crucial respect:  while Singh's decision to spend most of his time abroad was arguably motivated by convenience, Hana's similar decision was clearly motivated by the safety and welfare of her family.

The record before us compels a finding that there is not clear, unequivocal, and convincing evidence that Hana's trips to Iraq constitute abandonment of her LPR status.  Accordingly, we GRANT the petition for review and we VACATE the order of removal.  We REMAND this matter to the Board for termination of removal proceedings.